Joseph Faulkner and Marjorie Faulkner v. Commissioner.
Faulkner v. Commissioner
Docket No. 52665.
United States Tax Court
T.C. Memo 1956-39; 1956 Tax Ct. Memo LEXIS 259; 15 T.C.M. (CCH) 175; T.C.M. (RIA) 56039; February 21, 1956
T. Holmes Bracken, Esq., 205 Church St., New Haven, Conn., for the petitioners. Frank V. Moran, Jr., Esq., for the respondent. KERN
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $1,190.94 in the income tax of petitioners for the year 1950. The only issue for decision is whether the amount of $10,000 received by petitioners during that year for a covenant not to compete was taxable as ordinary income or as capital gain from the sale of their business. Findings of Fact The petitioners are husband and wife and reside in East Haven, Connecticut. They filed their joint income tax return for 1950 on the cash basis with the collector of internal revenue for the district of Connecticut. For 10 years *260 prior to 1939 petitioner Joseph Faulkner worked as a soft drink and beverage salesman. In the course of this employment he became personally acquainted with four or five hundred people upon whom he called weekly. Before that he had worked for a coat, apron, and towel supply firm and had also learned that business. In 1939 Joseph and his wife Marjorie decided to go into business for themselves and to operate a coat, apron and towel supply service under the name of Faulkner's Linen Service. The business consisted of renting coats, aprons, towels, pants, dental gowns, dresses and similar linen items by the week to customers such as druggists, taverns, grills, beauty parlors, and grocery stores. It was always conducted from the petitioners' home. Marjorie took care of the orders, handled the customers on the telephone, did all the mending and bookkeeping, and helped on the truck when they were very busy. Joseph drove the truck and serviced all of the customers with the help of one young employee. The linen supplies were sent out to be laundered because petitioners did not have their own laundry. The customers had known Joseph for 20 to 25 years because he had dealt with them when he *261 was selling beverages. At the time the business was sold it had about 700 or 800 customers. Petitioners were in competition with Central Coat Apron & Linen Service, Inc., of New Haven, Connecticut, a large concern with branches in many Connecticut cities. The latter's competitive methods had caused petitioners considerable difficulty, and they were finally induced to sell their business to Central when their laundry informed them that it could no longer handle their work and they were unable to obtain the services of another laundry. The initial discussion for the purchase of petitioners' business was based upon a purchase price of $65 per dollar of linen supply business done each week. That price was to include a payment for good will and also for a covenant by petitioners not to compete for 10 years without which Central would not have purchased the business. Petitioner Joseph, who is presently working in a factory, is still getting calls from his old customers as to when he is going to go back into business. The petitioners entered in a contract for the sale of their linen service business to Central Coat Apron & Linen Service, Inc., on February 15, 1950. Briefly summarized, *262 the contract provided as follows: 1. Petitioners sold and Central purchased the former's linen supply business including its good will and "all its customers and customers' routes and all records pertaining to said customers, customer routes and collections made thereon, together with" the various articles of merchandise used in the business, its fixtures and its truck. 2. The tentative purchase price was $19,250 plus a payment of $5,000 each to Joseph and Marjorie for the restrictive covenants further described below. 3. The final purchase price was to be determined by a computation based upon the average weekly business of petitioners over a two-week period from February 16, 1950, to March 1, 1950, and depended upon how much this average varied, either up or down, from an assumed norm of $450 per week. An agent of the purchaser was to accompany Joseph on his rounds to check the receipts during the test period. 4. The sum of $5,000 was to be paid as a deposit and the balance was due two weeks after the bill of sale was recorded. 5. Certain accounts receivable and other assets were excluded from the purchase, and provision was made for the allocation of interim accounts receivable *263 and expenses. 6. In addition to the usual warranties and representations, the contract also provided, in part, as follows: "The purchase hereunder is made upon the following terms and conditions, covenants, representations and provisions each of which the Parties of the First Part and the Party of the Second Part, jointly and severally make and agree to perform or cause to be performed: a) The Parties of the First Part, jointly and severally, covenant that for a period of ten years from date they shall not, nor shall either or both of them, at any time or times directly or indirectly, whether as principal, agent employer, employee, stockholder, Director or in any other individual or representative capacity whatever, solicit, serve, supply linen or launder supplied linen for, or assist or be engaged or connected with any other person firm or corporation soliciting, serving or laundering supplied linen for any of the present linen supply customers of the Parties of the First Part in the Towns of Wallingford, West Haven, East Haven, Milford, New Haven, North Haven, Branford, Hamden, Derby and Orange in the State of Connecticut; and that they shall not, nor shall either or both of *264 them for such period of ten years from the date hereof, launder for any person, firm or corporation engaged in the linen supply business or directly or indirectly engaged in the linen supply business or any branch thereof in the Towns and Cities of the State of Connecticut in which the Parties of the First Part are now engaged in the linen supply business; and that they shall not, nor shall either or both of them do anything whatever to prejudice the goodwill of the business sold hereunder or of the said restrictive covenants to inure to the benefit of the Party of Second Part, its successors and assigns; * * * e) The Parties of the First Part agree to reasonably cooperate with the Party of the Second Part in introducing the representative of the latter to any and all customers of the linen supply business sold hereunder; * * *" 7. The purchaser acquired the right to use the name Faulkner's Linen Service for such period of time as it saw fit. 8. An inventory was to be taken, a bill of sale was to be executed, and the final purchase price, allocated to the various items, was to be fixed therein. 9. Supplemental restrictive covenants, set out below, were to be executed as of the *265 same date to carry out the intent of the parties, and were incorporated in the contract. Joseph and Marjorie executed a bill of sale in favor of Central dated February 15, 1950, covering their linen supply business, including its good will, customers, customer routes, and records, merchandise, truck and fixtures. The total purchase price for the above items was $13,862.80, of which $3,000 was allocated to good will. On February 15, 1950, Joseph and Marjorie also entered into the following covenants not to compete: "In consideration of the purchase, simultaneously herewith, by CENTRAL COAT, APRON & LINEN SERVICE, INC. of the business and assets of the undersigned FAULKNER LINEN SERVICE and for one dollar and other valuable considerations, the receipt whereof is hereby acknowledged, each of the undersigned hereby covenants and agrees to and with said Central Coat, Apron & Linen Service, Inc., its successors and assigns, that it or they will not at any time, directly or indirectly whether as principal, agent, employer, employee or in any other individual or representative capacity whatever, serve, solicit, divert or accept the business of any of the customers comprised or embraced *266 in the routes and business so sold or in any way assist, be interested in or connected with any person, firm or corporation so doing; nor will it or they do anything whatever to prejudice the retention and enjoyment by said Central Coat, Apron & Linen Service, Inc., its successors or assigns, of the routes, business and good will so sold. "And whereas it would be impossible to measure the damages flowing from a violation of the foregoing covenants and whereas the injured party would be without adequate remedy at law, each of the undersigned agrees that the covenantee, its successors or assigns, shall, in the event of such violation, be entitled to an injunction restraining any further violation - such injunction to be in addition to any and all other remedies. "WITNESS the hands and seals of the undersigned this 15 day of February 1950. "Faulkner Linen Service "By (Signed) Joseph P. Faulkner "(Signed) Marjorie B. Faulkner "Whereas CENTRAL COAT APRON & LINEN SERVICE, INC. a Connecticut corporation, having its principal place of business in New Haven, Connecticut is purchasing simultaneously herewith, the business and all tangible assets pertaining thereto of FAULKNER LINEN *267 SERVICE, a Connecticut partnership, and "Whereas the undersigned have heretofore been the joint owners of said business and "Whereas said Central Coat Apron & Linen Service, Inc. desires that the undersigned enter into the restrictive covenant hereinafter set forth, and is willing to pay therefore to each of the undersigned the sum of $5000.00, "NOW, THEREFORE, in consideration of said sum of $5000.00 paid to each of the undersigned, the receipt whereof is hereby acknowledged, each of the undersigned - in addition to the restrictive covenant already entered into by him with said Central Coat Apron & Linen Service, Inc. - hereby agrees and with the latter, its successors and assigns, that he will not for a period of ten (10) years from the date hereof, directly or indirectly, whether as principal, agent, employer, employee, stockholder or in any other individual or representative capacity whatever, engage in any of the cities or towns of Connecticut where he is now engaged in any business similar to that sold to it by Faulkner Linen Service as hereinabove stated, nor will he during said period launder for or in any way assist, be interested or connected with any other persons, *268 firm or corporation, so doing, nor will he divulge to anyone the customers' names, addresses, requirements or prices now paid to him by any of his present customers. "And whereas it would be impossible to measure the damages flowing from a violation of the foregoing covenants and whereas the injured party would be without adequate remedy at law, each of the undersigned agrees that the covenantee, its successors or assigns, shall in the event of such violation, be entitled to an injunction restraining any further violation - such injunction to be in addition to any and all other remedies. "WITNESS the hands of the parties hereto the 15th day of February, 1950. "(Signed) Joseph P. Faulkner "(Signed) Marjorie B. Faulkner" The covenants not to compete were not severable from the sale of the assets, good will and business of the Faulkner Linen Service. Opinion KERN, Judge: Respondent has determined that the $10,000 received by petitioners for their covenants not to compete with the purchaser of their linen supply business for 10 years is ordinary income while petitioners contend that it is taxable as long term capital gain. In , appeal *269 dismissed (C.A. 10, 1950), , we had before us the problem of the taxation of certain percentage monthly payments to be made to the seller of an accounting practice in consideration of the good will of his firm and his covenant not to compete with the purchaser for 6 years. We stated at pages 147 and 148 of our opinion: "It is well settled that if, in an agreement of the kind which we have here, the covenant not to compete can be segregated in order to be assured that a separate item has actually been dealt with, then so much as is paid for the covenant not to compete is ordinary income and not income from the sale of a capital asset. . On the other hand, where the covenant not to compete accompanies the transfer of good will in the sale of a going concern and it is apparent that the covenant not to compete has the function primarily of assuring to the purchaser the beneficial enjoyment of the good will which has been acquired, the covenant is regarded as nonseverable and as being in effect a contributing element of the assets transferred. ; ; *270 Aaron Michaels, supra [12 T.C. 17]." Where the second situation exists, namely, the sale of a going business as a single transaction, the fact that the contract specifically provides for two separate and distinct considerations, one for the covenant not to operate and one for the business' assets, does not make the amount received for the former ordinary income. . In the cited case, $780,000 was paid for the covenant not to compete and only $100,000 for certain intangible assets of the taxpayer. The respondent argues that it "is well settled that consideration received under an agreement not to compete is taxable as ordinary income, and is in no sense capital gain", citing , affd. (C.A. 2, 1936) ; ; . We need merely quote from our opinion in , to show how clearly distinguishable the foregoing cases are from the instant case. "Among the authorities strongly *271 urged by the respondent to sustain his contention that the consideration named in the contract of sale for Toledo's agreement to cease publication of its newspaper and not to compete for a period of ten years was not to be considered as a part of the selling price of the newspaper, but must be considered as gross income under section 22(a), Revenue Act of 1938, are ; ; affd. ; and ; affirming . "It is undoubtedly true that the above cases do hold that where a corporation sells out its going business to a purchaser and incidental to such transaction some officer or employee or stockholder of the selling corporation agrees with the purchaser that he will not compete for a given number of years with the purchaser of the business and the purchaser pays him a consideration for such agreement, the consideration thus received by the officer, employee, or stockholder of the selling corporation is taxable income to him under section 22(a). The reason for this is that he himself has *272 sold no capital asset but has simply received a sum of money for agreeing not to compete. * * * "Toledo contends that the above mentioned cases are distinguishable because the payments in those cases for promises not to compete were made to the stockholders of the selling corporation rather than to the selling corporation itself or to persons who were not the owner seller of any business. "We think that petitioners are correct in contending that the above cases are distinguishable on their facts from the instant case. A reading of them will show (a) that the promise not to compete was unrelated to any sale made by the promisor and (b) that the promise not to compete did not operate as a restraint upon any property of the promisor and was not, therefore, an inherent part of anything sold by the promisor." The respondent also relies upon , and , affirming , as authorities for taxing the amounts received for the covenants herein as ordinary income. In the Horton case, we found as a fact that the covenant not to compete was severable from the sale *273 of the good will of the taxpayer's accounting practice and allocated 50 per cent of the percentage payments in question to each. The contract in that case provided that the percentage payments were to the reduced 50 per cent in the event the taxpayer died or ceased to be a bona fide resident of the state, and it was, therefore, evident that one-half of the payments was for the purchase of good will and one-half for the covenant which would no longer be required if either of the two foregoing events occurred. In the Hamlin case, the sellers of the stock of a newspaper corporation individually covenanted not to compete for 10 years with the purchaser of the stock in a specified area. The opinions of both this Court and the Court of Appeals for the Tenth Circuit specifically pointed out that the taxpayers therein were not selling a going business together with its good will, in which event the covenant not to compete might have been regarded as nonseverable. They merely sold stock. The Hamlin case supports the petitioner, not the respondent. In the instant case, petitioners owned and operated the business which they sold as a going concern. It seems certain that the purchaser would *274 have derived little benefit from the acquisition of the good will, customer routes, lists and records of the Faulkner Linen Service unless both Joseph and Marjorie were restrained from reentering the business for a considerable period of time. The covenants not to compete were essential to the protection of the purchaser's investment in the foregoing assets of the business, they were made by the sellers of a going business, and they were nonseverable from the assets transferred. The amounts received thereunder are to be taxed as part of the receipts from the sale of the business and not as ordinary income. ; cf. ; see also ; , affd. (C.A. 1950), , certiorari denied . Decision will be entered under Rule 50.